UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| BRYANT IBEKWE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 3:18-cv-89 |
| v. | ) | |
| | ) | **COMPLAINT** |
| BLOOD ORANGES LLC; CRISSCROSS | ) | |
| FUNDING; MINICAST LLC; NATIVE | ) | |
| DIGITAL INC.; AMY HILL; MIGUEL | ) | |
| SOSA; JULIET SUMMER THOMSON; | ) | |
| SCOTT WARD; and JAMES LINEN | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Bryant Ibekwe, complaining of Defendants Blood Oranges LLC, a Wyoming limited liability company; CrissCross Funding, a Missouri nonprofit corporation; Minicast LLC, a Delaware limited liability company; Native Digital, Inc., a Delaware corporation; Amy Hill; Miguel Sosa; Juliet Summer Thomson; Scott Ward; and James Linen, alleges:

**PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff Bryant Ibekwe ("Mr. Ibekwe") is a citizen and resident of the State of North Carolina, Mecklenburg County.

2.      Upon information and belief, Defendant Blood Oranges LLC ("Blood Oranges") is a Wyoming limited liability company with its principal place of business in California.  Upon information and belief, Blood Oranges transacts business in North Carolina.

3.      Upon information and belief, Defendant CrissCross Funding ("CCF") is a Missouri nonprofit corporation with its principal place of business in California.   Upon information and belief, CCF transacts business in North Carolina.

30305327

4.     Upon information and belief, Defendant Minicast LLC ("Minicast") is a Delaware limited liability company with its principal place of business in California.  Upon information and belief, Minicast transacts business in North Carolina.

5.     Upon information and belief, Defendant Native Digital Inc. ("Native Digital") is a Delaware corporation with its principal place of business in California.  Upon information and belief, Native Digital transacts business in North Carolina.

6.     Upon information and belief, Defendant Amy Hill ("Hill") is a resident of the state of Oregon and/or California.  Hill is associated with the management of Blood Oranges, CCF, Minicast and Native Digital.

7.     Upon information and belief, Defendant Miguel Sosa ("Sosa") is a resident of the state of California.  Sosa is associated with the management of Minicast and Native Digital.

8.     Upon information and belief, Defendant Juliet Summer Thomson ("Thomson") is a resident of the state of California.  Thomson is associated with the management of Minicast and Blood Oranges.

9.     Upon information and belief, Defendant Scott Ward ("Ward") is a resident of the state of California and/or Colorado.  Ward owns, operates, manages and/or controls Blood Oranges, CCF, Minicast and Native Digital.

10.     Upon information and belief, Defendant James Linen ("Linen") is a resident of Washington, D.C.  Linen is associated with the management of CCF, Minicast and Native Digital.

11.     This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934, as amended (the "'34 Act"), 15 U.S.C. § 78aa, as well as

30305327

28 U.S.C. §§ 1331 (federal question jurisdiction), 1332 (diversity jurisdiction) and 1367 (supplemental jurisdiction).

12.     Venue is proper in this district and division pursuant to Section 27 of the '34 Act and 28 U.S.C. § 1391(b), in that acts or transactions violating the '34 Act and the rules promulgated thereunder occurred in this district and division, and in that a substantial part of the events or omissions giving rise to the claim occurred in this district and division.

## BACKGROUND FACTS

13.     This litigation arises out of the fraudulent and deceitful conduct of Defendants, who lied and deceived Mr. Ibekwe over a period of several years in order to induce him to invest in various alleged business ventures, with no intention of ever using the funds they appropriated from Mr. Ibekwe for their stated purpose, and with no intention of ever repaying Mr. Ibekwe the amounts of his investments.

14.     Mr. Ibekwe met Defendant Hill in the summer of 2010.  At the time, Ms. Hill told Mr. Ibekwe about her life and her work as a missionary.  Mr. Ibekwe and Ms. Hill lost contact, but reconnected in 2013, around the time Mr. Ibekwe had been undertaking more philanthropy work.

15.     CCF, Native Digital, Blood Oranges, and Minicast (the "Entity Defendants") are owned, operated, managed and/or controlled by Ms. Hill, Mr. Sosa, Ms. Thomson, Mr. Linen and Mr. Ward (the "Individual Defendants").

16.     Defendants Hill and Ward also represented to Mr. Ibekwe that they owned, operated, managed and/or controlled Liberty Movie, LLC, a California limited liability company ("Liberty Movie").

3

17. The Individual Defendants have operated through the Entity Defendants to perpetuate their fraud on Mr. Ibekwe and others.

18. The Individual Defendants fraudulently induced Mr. Ibekwe to loan money to CCF and Blood Oranges, and to invest in Native Digital and Liberty, with no intention of repaying Mr. Ibekwe the full amounts of his loans or investments.

19. The Individual Defendants defrauded Mr. Ibekwe and, on information and belief, other investors by creating sham entities for purposes that they never intended to use those entities for.

20. The Individual Defendants had no intent on following through with any of the businesses they created. Instead, Defendants used good business ideas to lure investors to pay for their high-end lifestyles, and then failed to follow through or execute their business ideas and failed to repay their investors.

A.    **CrissCross Funding Loan**

21. Upon information and belief, Defendants Hill and Ward are the principal owners, managers and officers of CCF.

22. Upon information and belief, Defendant Linen is associated with the management of CCF.

23. CCF held itself out as a 501(c)(3) nonprofit that focused on sending trauma counselors to areas affected by natural and other disasters.

24. Defendant Hill approached Mr. Ibekwe about loaning money to CCF.

25. Ms. Hill told Mr. Ibekwe that she and the other Individual Defendants were starting a charitable project through Greenzones Projects Limited ("Greenzones"), an entity chartered in Ireland which is owned and operated by Defendant Linen, and asked Mr. Ibekwe to

4

loan them money through CCF in order to invest in and assist with the development of Greenzones.

26.     Because of his friendship with Ms. Hill, and based on Ms. Hill's promise that they would repay Mr. Ibekwe the full amount of the loan, Mr. Ibekwe agreed to loan CCF funds for its purported charitable purposes.

27.     On or about November 7, 2013, Mr. Ibekwe loaned CCF $19,400.00, to be repaid on December 7, 2013 without interest.  The November 2013 CCF loan was evidenced by a CrissCross Funding Loan Agreement dated November 7, 2013, executed by Defendant Ward.  A true and correct copy of the November 7, 2013 CrissCross Funding Loan Agreement is attached hereto as **Exhibit A.**

28.     On April 27, 2015, Defendant Hill requested that Mr. Ibekwe loan CCF an additional $5,000.00 and offered to pay 10% interest on the total loan because he had "been so patient with" them.  A true and correct copy of the April 27, 2015 e-mail is attached hereto as **Exhibit B.**

29.     Mr. Ibekwe agreed to loan the additional $5,000.00 to CCF in exchange for CCF's agreement to pay 10% interest on the total loan.

30.     On or about April 30, 2015, Ms. Hill sent Mr. Ibekwe a new CrissCross Funding Loan Agreement (the "CCF Loan Agreement"), reflecting the additional amounts loaned to CCF by Mr. Ibekwe and CCF's agreement to repay those amounts with 10% interest.  The CCF Loan Agreement states in pertinent part:  "This is to certify that Bryant Ibekwe is herewith loaning CrissCross Funding, the amount of $29,370 to be repaid in full by CrissCross Funding to Bryant by August 7th 2015."  A true and correct copy of the CCF Loan Agreement is attached hereto as **Exhibit C.**

31.     CCF did not timely repay Mr. Ibekwe under the CCF Loan Agreement.

32.     Mr. Ibekwe has not been repaid any of the amounts he is owed pursuant to the CCF Loan Agreement.

33.     CCF's failure to repay the amounts due under the CCF Loan Agreement by August 7, 2015, is a breach of the CCF Loan Agreement.

34.     Mr. Ibekwe is currently owed $29,370.00 under the CCF Loan Agreement, plus interest which continues to accrue at a rate of 10%.

35.     Upon information and belief, CCF has been administratively dissolved and has been operating through the sole actions of Defendants Hill, Ward, and Linen.

**B.     Liberty Movie Investment**

36.     In or around September 2015, Defendants Hill and Ward approached Mr. Ibekwe about investing in a movie project based on the script "Liberty" written by William J. MacDonald.

37.     Ms. Hill and Mr. Ward told Mr. Ibekwe that they needed money to purchase the script for "Liberty."

38.     Mr. Ibekwe met several individuals who were purportedly involved in the "Liberty" movie.

39.     On or about September 30, 2015, Mr. Ibekwe entered into a Development and Financing Agreement with Blood Oranges pursuant to which Mr. Ibekwe agreed to loan Blood Oranges $25,000.00 in connection with the production of a movie based on the script "Liberty." A true and correct copy of the September 30, 2015 Development and Financing Agreement is attached hereto as **Exhibit D.**

40.     On or about October 11, 2015, Mr. Ibekwe entered into a Development Investment Agreement with Blood Oranges pursuant to which Mr. Ibekwe agreed to loan Blood

6

Oranges an additional $25,000.00, for a total of $50,000.00, in connection with the production of the "Liberty" movie. A true and correct copy of the October 11, 2015 Development Investment Agreement is attached hereto as **Exhibit E.**

41.     On or about November 10, 2015, Mr. Ibekwe entered into a Development Investment Agreement with Liberty Movie (the "Liberty Investment Agreement"), a true and correct copy of which is attached hereto as **Exhibit F.** The Liberty Investment Agreement was signed by Defendant Hill on behalf of Liberty Movie, and purported to supersede the earlier agreements between Mr. Ibekwe and Blood Oranges. (Liberty Investment Agreement p. 4, § 10).

42.     Pursuant to the Liberty Investment Agreement, Mr. Ibekwe invested an additional $50,000.00, for a total of $100,000.00, in Liberty Movie, in connection with the development, production and distribution of the "Liberty" movie project. (Liberty Investment Agreement § 2).

43.     The Liberty Investment Agreement states that:

the Producer [Liberty Movie] has been established to develop, produce, own, distribute and exploit a Motion Picture based on the script known as "Liberty", written by Bill MacDonald, (the "Project"), and the Investor [Mr. Ibekwe] desires to invest in, obtain an Executive Producer credit and share in the profits of the Project, including, with limitation, profits derived from the Project's exploitation in any and all media.

(Liberty Investment Agreement, p. 1).

44.     Liberty Movie agreed to repay Mr. Ibekwe the outstanding principal of $100,000.00, plus interest at a rate of fourteen percent (14%) after the project was completed but no later than November 10, 2018. (Liberty Investment Agreement §§ 2.1, 2.2).

45.     Defendants Hill and Ward held themselves out to be the principal owners, managers and officers of Liberty Movie.

7

46.     The principal amount of $100,000.00 remains outstanding under the Liberty Investment Agreement, plus interest which continues to accrue at a rate of 14%.

## C.     **Blood Oranges Loan**

47.     In or around January 2016, Defendants Hill, Sosa, Thomson and Ward requested that Mr. Ibekwe loan them funds to rent a house in Utah for the Sundance Film Festival.

48.     On or about January 22, 2016, Mr. Ibekwe entered into a Loan Agreement with Blood Oranges (the "Blood Oranges Agreement"), pursuant to which Mr. Ibekwe agreed to loan Blood Oranges $14,368.03 for the Sundance house, to be repaid within seven days without interest.

49.     The Blood Oranges Agreement was signed by Defendant Hill on behalf of Blood Oranges.  A true and correct copy of the Blood Oranges Agreement is attached hereto as **Exhibit G**.

50.     On or about February 2, 2016, Blood Oranges repaid Mr. Ibekwe $14,000.00 of the Blood Oranges Loan.

51.     $368.03 remains delinquent under the Blood Oranges Loan.

52.     Blood Oranges' failure to repay Mr. Ibekwe the full amount of the loan by January 29, 2016 constitutes a breach of the Blood Oranges Agreement.

53.     Upon information and belief, Blood Oranges has been administratively dissolved and has been operating through the sole actions of Defendants Hill, Sosa, Thomson and Ward.

## D.     **Native Digital Investment**

54.     Upon information and belief, Defendants Hill, Ward and Sosa are the principal shareholders, directors and officers of Native Digital.

55.     Upon information and belief, Defendant Linen is associated with the ownership and/or management of Native Digital.

8

56.     In or around January 2016, Defendants Hill, Ward and Sosa approached Mr. Ibekwe about investing in a new business venture called Native Digital. Defendants Hill, Ward and Sosa told Mr. Ibekwe that Native Digital was the parent company of two other entities called "Native Beauty" and "Native Music."

57.     Defendants Hill, Ward and Sosa told Mr. Ibekwe that Native Digital was a project they were developing to bridge the gap between influencers and companies who were looking for influencers to market their products.

58.     On or about February 4, 2016, Mr. Ibekwe and Native Digital entered into the Native Digital Development Investment Agreement, pursuant to which Mr. Ibekwe invested $100,000.00 in Native Digital to be repaid with fourteen percent (14%) interest when the Company Platform (as defined therein) had been created and was running efficiently, but no later than February 4, 2017. A true and correct copy of the February 4, 2016 Native Digital Development Investment Agreement is attached hereto as **Exhibit H**.

59.     According to the Native Digital Development Investment Agreement, Native Digital was

> established to create an online and mobile platform (the "Company Platform") to provide social media influencers the opportunity to collaborate with brands and advertisers. The Company provides the influencers with the ability to advertise directly to those viewers without alienating them through disruptive banner-ads and pop-ups. The Company facilitates this organic advertising approach by facilitating direct placement of products and brands within influencer's videos.

February 4, 2016 Native Digital Development Investment Agreement, p. 1.

60.     In or around February 2016, Defendants Hill, Ward and Sosa approached Mr. Ibekwe about increasing his investment in Native Digital.

61.     On or about February 26, 2016, Mr. Ibekwe and Native Digital entered into a new Native Digital Development Investment Agreement (the "Native Investment Agreement"),

pursuant to which Mr. Ibekwe invested an additional $25,000.00 in Native Digital, for a total of $125,000.00. A true and correct copy of the Native Investment Agreement is attached hereto as **Exhibit I**.

62. Pursuant to the Native Investment Agreement, Native Digital agreed to repay Mr. Ibekwe the principal amount of $125,000.00, plus interest at a rate of 14%, when the Company Platform was created and was running efficiently, but no later than February 26, 2017. (Native Investment Agreement, §§ 2, 2.1, 2.2). The Native Investment Agreement purported to supersede the earlier agreement between Mr. Ibekwe and Native Digital. (*Id.* § 10).

63. Native Digital did not repay Mr. Ibekwe any of the amounts owed under the Native Investment Agreement by February 26, 2017.

64. Mr. Ibekwe has not been repaid any of the amounts he is owed pursuant to the Native Investment Agreement.

65. Native Digital's failure to repay the amounts due under the Native Investment Agreement by February 26, 2017, is a breach of the Native Investment Agreement.

66. Mr. Ibekwe is currently owed the principal balance of $125,000.00, plus interest which continues to accrue at a rate of 14%.

**E.      Defendants' Fraudulent Scheme Regarding Native Digital and Minicast**

67. In or around March 2016, Mr. Ibekwe began to notice irregularities in the way Native Digital's finances and operations were structured.

68. Specifically, Mr. Ibekwe became aware that there was a possibility that the money he was investing in Native Digital was not actually going to the investors, but rather was being sent to Minicast, a different entity owned, operated and/or managed by Defendants Hill, Sosa, Thomson, Linen, and Ward.

69. Mr. Ibekwe also became aware of the possibility that, contrary to the information he had been given by Defendants Hill, Sosa and Ward in order to induce him to invest in Native Digital, Native Digital was not actually the parent company for Native Beauty and Native Music.

70. On March 16, 2016, Mr. Ibekwe sent an e-mail to Defendants Hill, Sosa and Ward, voicing his concerns regarding Native Digital. Specifically, Mr. Ibekwe asked why his payments to Native Digital were posting to Minicast; requested that Defendants provide him with a formal document stating who owns what percentages of Native Digital; requested that monthly, quarterly, semi-yearly and yearly statements (i.e., formal balance sheets) be sent out to all stakeholders; asked Defendants to provide copies of contracts with Native Digital clients; and raised other various financial, operational and technological concerns. A true and correct copy of the March 16, 2016 e-mail is attached hereto as **Exhibit J**.

71. On March 18, 2016, Mr. Ibekwe e-mailed Defendants Hill, Sosa and Ward, stating that he wanted to make certain changes to the Native Investment Agreement; requesting a copy of Native Digital's original Articles of Incorporation; again requesting that Defendants send him information regarding ownership percentages in Native Digital; and requesting that Defendants properly document Mr. Ibekwe's 2.5% ownership in Native Digital. A true and correct copy of the March 18, 2016 e-mail is attached hereto as **Exhibit K**.

72. On March 19, 2016, Mr. Ibekwe e-mailed Defendants Hill, Sosa and Ward stating that there was

some confusion about Native/Native Digital. Is Native Digital the parent company of Native Beauty and Native Music? When we talked in Salt Lake, my investment was supposed to be at the Parent Company Native. That's the whole reason you talked about Chef Tone and Native Music to show that he was only getting 49% of Native Music and I was investing at the Parent company which encompasses it. In reading this agreement it doesn't appear that is the case. If this is not the case we need to talk to address this as I feel that I have been misled. This is why I raised the question about the contract a few days back. But then I

30305327

was told that Native Digital is the parent company. Are we on the same page here? If not, then we need to come to an amicable agreement such as getting my investment back minus interest, fixing the contract, etc. I haven't received any of the documentation that I asked for. When can I expect to receive them?

A true and correct copy of the March 19, 2016 email is attached hereto as **Exhibit L**.

73. On March 20, 2016, Defendant Ward responded to Mr. Ibekwe stating "With all your [sic] saying, i believe the best idea you've said is to pay you back. I believe it's all to [sic] much of a Risk for you and your family at this point…. We will get together with our lawyer and get you organised and payed [sic] back, asap." A true and correct copy of the March 20, 2016 email is attached hereto as **Exhibit M**.

74. Mr. Ibekwe replied that he was "on board with" Defendant Ward's suggestion that Native Digital repay him, and that the e-mails should serve as "our mutual agreement to dissolve my interest and any ownership of all things Native." A true and correct copy of the March 20, 2016 email is attached hereto as **Exhibit N**.

75. Upon information and belief, Defendants Hill, Sosa and Ward never had any intention to comply with the terms of the Native Investment Agreement, never intended to establish a Company Platform (as defined in the Native Investment Agreement), and never had any intention to repay Mr. Ibekwe the amount of his investment or to establish the Company Platform.

F. **Defendants' Fraudulent Scheme Regarding Liberty Movie**

76. On April 23, 2016, Mr. Ibekwe received a letter from David Walker. On information and belief, this letter was sent to all of Liberty's investors. A true and correct copy of the April 23, 2016 letter is attached hereto as **Exhibit O**.

77. Mr. Walker stated that he was the sole owner, sole authorized signer and sole member-manager of Liberty Movie, which owns the William MacDonald script "Liberty," the

film concept, and any related intellectual property prepared appurtenant thereto and any derivative work based thereon.

78.     Mr. Walker stated that it had recently come to his attention that unauthorized entities and/or individuals were using the project as a premise to raise money under the pretense of developing the film.

79.     Mr. Walker stated that the person signing on behalf of Liberty, Defendant Hill, never had any authorization to sign on behalf of Liberty or solicit or receive funds for Liberty and that her solicitations constituted intentionally fraudulent misrepresentations.

80.     Mr. Walker further stated that Blood Oranges does not own or control the rights to Liberty or its related intellectual property.

81.     Upon information and belief, Defendants Hill and Ward never had any intention or ability to comply with the Liberty Investment Agreement, and never had any intention to repay Mr. Ibekwe the amount of his investment or to develop, produce, own, distribute or exploit a motion picture based on the script for "Liberty."

82.     Upon information and belief, at the time Defendants Hill and Ward told Mr. Ibekwe they needed money to purchase the "Liberty" movie script, the script had already been purchased, and Defendants Hill and Ward used Mr. Ibekwe's investment for things unrelated to the "Liberty" movie.

83.     Upon information and belief, Defendants Hill and Ward had no intention of making the "Liberty" movie, and instead were using the names attached to the movie to obtain more money to pay for their extravagant lifestyle, which they could no longer afford.

30305327

**G.** **The Entity Defendants are Sham Entities Designed to Defraud Investors and Creditors**

84.     Upon information and belief, at all times relevant to this lawsuit, there existed a unity of ownership between all of the Entity Defendants, on the one hand, and Defendants Ward, Hill, Linen, and Sosa, on the other hand, such that the individuality and separateness between them ceased and that the Entity Defendants are the alter egos of Defendants Ward, Hill, Linen, and Sosa in that, among other things: (a) Defendants Ward, Hill, Linen, and Sosa controlled, dominated, managed and operated the Entity Defendants as their alter egos; (b) Defendants Ward, Hill, Linen, and Sosa make all decisions pertaining to the Entity Defendants; (c) there has been a failure to comply with or observe the formalities of corporate formation and/or operation; (d) the Entity Defendants were so inadequately capitalized as to not be able to carry out their intended businesses and pay their debts and obligations as they fell due; and (e) the individuality of said Entity Defendants is a total sham and fiction, and should be disregarded pursuant to the doctrine of piercing the corporate veil.

85.     Upon information and belief, Defendants Ward, Hill, Linen, and Sosa: (a) used the offices, cash, and personnel of the Entity Defendants to benefit themselves to the detriment of the Entity Defendants; (b) conducted business of the Entity Defendants from the same office using the same office equipment, office furniture, employees, office space, computers, and telephone lines; (c) engaged in self-dealing; (d) wrongfully diverted corporate funds for their own personal use, or for the benefit of other businesses they own; (e) failed to maintain appropriate financial records and accepted accounting practices; (e) excessively compensated family members and friends employed by the Entity Defendants; (f) utterly failed to exercise proper cash management practices; and (g) utilized the bank accounts of the Entity Defendants as

14

their own personal bank accounts and used corporate funds to purchase personal items and to pay personal debts.

86.     Specifically, and without limitation, Defendant Ward used funds in the bank account of CCF – a purported nonprofit – to pay his personal debts via a linked PayPal account.

87.     Upon information and belief, the Entity Defendants constitute a single entity, as there is a high interdependency of operations; commonality between management, directors and officers; commingling of funds, assets and business operations to such an extent that there is no distinction between them; employment of the same employees; and consolidation of financial, strategic, legal and human resources operations.  None of the Entity Defendants are operated as separate companies, and the Entity Defendants have commingled funds and operated without any corporate formalities.

88.     Upon information and belief, Defendants Ward, Hill, Linen, and Sosa, by their complete exercise of dominion and control over said Entity Defendants, are the alter egos of the entity Defendants.  The foregoing Entity Defendants combine to constitute a single entity, all under the direction and control of Defendants Ward, Hill, Linen, and Sosa.  Indeed, as set forth above, there is a high interdependency of operations; there is commonality between management, directors and officers; there is a consolidation of financial, strategic, legal and human resources operations; and, at all relevant times, Defendants Ward, Hill, Linen, and Sosa have used and continued to use the entity Defendants as the assets of these entities for his own purposes.

89.     Such transfers of the revenues and assets of the Entity Defendants to Defendant Ward and Hill's personal use entitle Mr. Ibekwe to "pierce the corporate veil" as to the Entity Defendants.

## CLAIMS FOR RELIEF

### First Claim for Relief:  Securities Fraud Against Defendants Hill and Ward [Liberty Investment Agreement]

90.     The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

91.     The Liberty Investment Agreement was signed on behalf of Liberty Movie by Defendant Hill.

92.     The false representations made by Liberty Movie in the Liberty Investment Agreement, set forth in paragraphs 37 through 47 and 77 through 84 above, were caused by Defendants Hill and Ward and known by them to be false, in that Defendants Hill and Ward materially misrepresented their interest in Liberty Movie, LLC; materially misrepresented their ownership of  the movie script for "Liberty"; and materially misrepresented their intent to develop, produce and distribute "Liberty" the movie, among other things.

93.     Defendants Hill and Ward intended to and did deceive Plaintiff to induce him to enter into the Liberty Investment Agreement through the use of Defendants Hill and Ward's false representations.

94.     Plaintiff relied to his detriment upon the false representations of Defendants Hill and Ward contained within the Liberty Investment Agreement and was unable, in the exercise of appropriate due diligence, to discover the fraud.

95.     Plaintiff suffered damage as a result, in an amount to be proven at trial, but which is not less than $100,000.00.

96.     In connection with the acts, conduct and scheme alleged in the Complaint, Defendants Hill and Ward, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

16

97. By reason of the foregoing, Defendants Hill and Ward violated Section 10(b) of the '34 Act and Rule 10b-5 promulgated thereunder in that they

      a. employed devices, schemes and artifices to defraud;

      b. made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

      c. engaged in acts, practices, and a course of business which operated as a fraud and deceit and a scheme to defraud Plaintiff in connection with its purchase of stock with respect to the Liberty Investment Agreement.

## Second Claim for Relief: Securities Fraud Against Defendants Hill, Ward, Linen, and Sosa [Native Investment Agreement]

98. The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

99. The Native Investment Agreement was signed on behalf of Native Digital by Defendant Hill.

100. The false representations made by Native in the Native Investment Agreement, set forth in paragraphs 55 through 76 above, were caused by Defendants Hill, Ward, Linen, and Sosa and known by them to be false, in that Hill, Ward, Linen, and Sosa materially misrepresented their intent to create the Company Platform; materially misrepresented the extent of Mr. Ibekwe's interest; and materially misrepresented that Native Digital was a parent company for certain other Native entities, among other things.

101. Defendants Hill, Ward, Linen, and Sosa intended to and did deceive Plaintiff to induce him to enter into the Native Investment Agreement through the use of Defendants Hill, Ward, Linen, and Sosa's false representations.

30305327

102.     Plaintiff relied to his detriment upon the false representations of Defendants Hill, Ward, Linen, and Sosa contained within the Native Investment Agreement and was unable, in the exercise of appropriate due diligence, to discover the fraud.

103.     Plaintiff suffered damage as a result, in an amount to be proven at trial, but which is not less than $125,000.00.

104.     In connection with the acts, conduct and scheme alleged in the Complaint, Defendants Hill, Ward, Linen, and Sosa, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

105.     By reason of the foregoing, Defendants Hill, Ward, Linen, and Sosa violated Section 10(b) of the '34 Act and Rule 10b-5 promulgated thereunder in that they

a.     employed devices, schemes and artifices to defraud;

b.     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c.     engaged in acts, practices, and a course of business which operated as a fraud and deceit and a scheme to defraud Plaintiff in connection with its purchase of stock with respect to the Native Investment Agreement.

**Third Claim for Relief:  Control Person Liability Against Defendants Native Digital, Hill, Sosa, Linen, and Ward [Native Investment Agreement]**

106.     The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

107.     Corporations act through, among others, their officers, directors, agents and employees acting within the course and scope of their duties, and, accordingly, Native Digital, through the actions and inactions of Defendants Hill, Sosa, Linen, and Ward as alleged in the

Second Claim for Relief, also violated Section 10(b) of the '34 Act and Rule 10b-5 promulgated thereunder.

108.    Defendants Hill, Sosa, Linen, and Ward, at the time of the wrongs alleged in this Complaint, possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of Native Digital, through the ownership of voting securities, by contract, or otherwise.

109.    In connection with the acts, conduct and scheme alleged in the Complaint, Defendants Hill, Sosa, Linen, and Ward, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communication.

110.    Defendants Hill, Sosa, Linen, and Ward, by virtue of their positions as a significant shareholder, manager/member/president/chief executive officer of Native Digital were, at the time of the wrongs alleged in this Complaint, a controlling person of Native Digital within the meaning of Section 20(a) of the '34 Act, 15 U.S.C. § 78t(a).

111.    Plaintiff suffered damage as a result of the violations of § 10(b) of the '34 Act and Rule 10b-5 promulgated thereunder alleged in this Complaint, in an amount to be proved at trial but which is not less than $125,000.00.

112.    Defendants Hill, Sosa, Linen, and Ward are liable, jointly and severally, for such damage pursuant to Section 20(a) of the '34 Act, 15 U.S.C. § 78t(a).

**Fourth Claim for Relief:  Breach of Contract Against Defendant CCF [CCF Loan]**

113.    The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

30305327

114. Mr. Ibekwe and CCF entered into a contract, the CCF Loan, pursuant to which Mr. Ibekwe agreed to loan money to CCF in exchange for CCF's agreement to repay Mr. Ibekwe the amount of $29,370.00, in full, by August 7, 2015.

115. Mr. Ibekwe, at all times relevant to this action, has complied with all provisions of the CCF Loan.

116. Mr. Ibekwe has performed any and all conditions precedent under the CCF Loan.

117. CCF has positively, distinctly, unequivocally, and absolutely refused to perform under the CCF Loan and failed and refused to fulfill its promise to repay the amount of $29,370.00 in full to Mr. Ibekwe by August 7, 2015.

118. The actions of CCF constitute breaches of its contractual obligations under the CCF Loan.

119. As a result of CCF's breach of the CCF Loan, Mr. Ibekwe has sustained personal and economic damages in an amount to be proven at trial, but which is not less than $29,370.00, plus interest at the rate of 10%, plus statutory interest under applicable law.

**Fifth Claim for Relief:  Unjust Enrichment Against Defendants CCF, Hill, Linen, and Ward [CCF Loan]**

120. The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

121. Mr. Ibekwe conferred non-gratuitous benefits upon Defendants CCF, Hill, Linen, and Ward by loaning money to CCF for use in connection with CCF's purported charitable purpose.

122. Defendants CCF, Hill, Linen, and Ward knowingly and voluntarily accepted or retained such non-gratuitous benefits with full knowledge that Mr. Ibekwe expected repayment of the CCF Loan on time and in full.

30305327

123.     Permitting Defendants CCF, Hill, Linen, and Ward to retain the benefits conferred on them by Mr. Ibekwe would unjustly enrich Defendants at Mr. Ibekwe's expense.

124.     As a result of the above-described conduct of Defendants CCF, Hill, Linen, and Ward, Mr. Ibekwe has sustained personal and economic damages in an amount to be proven at trial, but which is not less than $29,370.00, plus interest at the rate of 10%.

**Sixth Claim for Relief:  Unjust Enrichment Against Defendants Hill and Ward [Liberty Investment Agreement]**

125.     The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

126.     Mr. Ibekwe conferred non-gratuitous benefits upon Defendants Hill and Ward by paying them money under the Liberty Investment Agreement under the pretense of investing in Liberty Movie.

127.     Defendants Hill and Ward knowingly and voluntarily accepted or retained such non-gratuitous benefits with full knowledge that Mr. Ibekwe expected repayment of his investment.

128.     Permitting Defendants Hill and Ward to retain the benefits conferred on them by Mr. Ibekwe would unjustly enrich Defendants at Mr. Ibekwe's expense.

129.     As a result of the above-described conduct of Defendants Hill and Ward, Mr. Ibekwe has sustained personal and economic damages in an amount to be proven at trial, but which is not less than $100,000.00, plus interest at a rate of 14%.

**Seventh Claim for Relief:  Breach of Contract Against Defendant Blood Oranges [Blood Oranges Loan]**

130.     The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

30305327

131.    Mr. Ibekwe and Blood Oranges entered into a contract, the Blood Oranges Loan, pursuant to which Mr. Ibekwe agreed to loan money to Blood Oranges to be repaid by Blood Oranges by January 29, 2016.

132.    Mr. Ibekwe, at all times relevant to this action, has complied with all provisions of the Blood Oranges Loan.

133.    Mr. Ibekwe has performed any and all conditions precedent under the Blood Oranges Loan.

134.    Blood Oranges has positively, distinctly, unequivocally, and absolutely refused to perform under the Blood Oranges Loan and failed and refused to fulfill its promise to repay the full amount of the loan to Mr. Ibekwe by August 7, 2015.

135.    The actions of Blood Oranges constitute breaches of its contractual obligations under the Blood Oranges Loan.

136.    As a result of Blood Oranges' breach of the Blood Oranges Loan, Mr. Ibekwe has sustained personal and economic damages in an amount to be proven at trial, but which is not less than $386.03.

## Eighth Claim for Relief – Breach of Contract Against Defendant Native Digital [Native Investment Agreement]

137.    The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

138.    Mr. Ibekwe and Native Digital entered into a contract, the Native Investment Agreement, pursuant to which Mr. Ibekwe agreed to invest $125,000.00 in Native Digital for the establishment of the Company Platform (as defined therein), to be paid back with 14% interest by February 26, 2017.

30305327

139.    Mr. Ibekwe, at all times relevant to this action, has complied with all provisions of the Native Investment Agreement.

140.    Mr. Ibekwe has performed any and all conditions precedent under the Native Investment Agreement.

141.    Native Digital has positively, distinctly, unequivocally, and absolutely refused to perform under the Native Investment Agreement and failed and refused to fulfill its promise to repay the full amount of the loan, with interest, to Mr. Ibekwe by February 26, 2017.

142.    The actions of Native Digital constitute breaches of its contractual obligations under the Native Investment Agreement.

143.    As a result of Native's breach of the Native Investment Agreement, Mr. Ibekwe has sustained personal and economic damages in an amount to be proven at trial, but which is not less than $125,000.00, plus interest at the rate of 14%, plus statutory interest under applicable law.

**Ninth Claim for Relief:  Unjust Enrichment Against Native Digital, Minicast, Hill, Ward, Linen, Thomson, and Sosa [Native Investment Agreement]**

144.    The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

145.    Mr. Ibekwe conferred non-gratuitous benefits upon Defendants Native Digital, Minicast, Hill, Ward, Linen, Thomson and Sosa by investing in Native Digital.

146.    Defendants Native Digital, Minicast, Hill, Ward, Linen, Thomson and Sosa knowingly and voluntarily accepted or retained such non-gratuitous benefits with full knowledge that Mr. Ibekwe expected repayment of his investment.

23

147.    Permitting Defendants Native Digital, Minicast, Hill, Ward, Linen, Thomson and Sosa to retain the benefits conferred on them by Mr. Ibekwe would unjustly enrich Defendants at Mr. Ibekwe's expense.

148.    As a result of the above-described conduct of Defendants Native Digital, Minicast, Hill, Ward, Linen, Thomson and Sosa, Mr. Ibekwe has sustained personal and economic damages in an amount to be proven at trial, but which is not less than $125,000.00.

**Tenth Claim for Relief:  Fraud Against All Defendants**

149.    The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

150.    Upon information and belief, Defendants defrauded Mr. Ibekwe by making affirmative representations about their intent to repay Mr. Ibekwe the amounts of his loans and investments into the various entity Defendants, specifically, their intent to repay the CCF Loan, the Blood Oranges Loan, the Native Investment Agreement and the Liberty Investment Agreement.

151.    Additionally, Defendants defrauded Mr. Ibekwe into investing in Liberty Movie by making affirmative misrepresentations that they owned the "Liberty" movie script and their intent to develop, produce, own, distribute and exploit a motion picture based on the script known as "Liberty" written by William MacDonald.  Defendants did not, at any time relevant to this action, own the "Liberty" script, make any attempt to obtain ownership of the "Liberty" script, or otherwise take any action to develop, produce, own, distribute or exploit the "Liberty" movie.

152.    Further, Defendants defrauded Mr. Ibekwe into investing into Native Digital by making affirmative misrepresentations to Mr. Ibekwe that Native Digital was the parent

company for Native Beauty and Native Music, that Mr. Ibekwe's investments into Native Digital would actually go into Native Digital, and that Defendants intended to create the Company Platform, when in fact Defendants knew that Native Digital was not the parent company for Native Beauty and Native Music, Mr. Ibekwe's investments into Native Digital would actually go into the account for an unrelated venture, Minicast, and when Defendants had no intention of ever creating the Company Platform.

153. Upon information and belief, at the time these representations were made, Defendants had no intent to fulfill their promises, no intent to repay Mr. Ibekwe the amounts of his loans and/or investments, no intent to develop, produce, own, distribute or exploit the "Liberty" movie or the "Liberty" movie script, and no intent to create the Native Digital Company Platform.

154. Defendants' improper actions were calculated to deceive, and did in fact deceive Mr. Ibekwe.

155. Defendants' improper actions were made with conscious or reckless disregard for the rights of Mr. Ibekwe.

156. Defendants' representations were material and false.

157. Defendants knew their representations were false when made and/or made them recklessly without regard for the truth.

158. Defendants intended that Mr. Ibekwe would rely upon their statements for their own financial gain and benefit, and Mr. Ibekwe did reasonably and justifiably rely upon Defendants' representations in that a reasonable person, in the exercise of ordinary care, would have relied on Defendants' false representations and would not have discovered Defendants' concealments of material fact.

159.    Defendants' fraudulent conduct directly and proximately resulted in injury and damage to Mr. Ibekwe.

160.    Mr. Ibekwe seeks and is entitled to recover compensatory and punitive damages from Defendants, jointly and severally, in an amount to be proven at trial.

**Eleventh Claim for Relief:  Unfair and Deceptive Trade Practices Against All Defendants**

161.    The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

162.    Defendants purposely deceived Plaintiff into (1) entering into the CCF Loan; (2) entering into the Liberty Investment Agreement; (3) entering into the Blood Oranges Loan; and (4) entering into the Native Investment Agreement, by misrepresenting Defendants' intention to repay Plaintiff for money loaned to Defendants pursuant to those agreements.  At the time these representations were made, Defendants did not intend to repay Plaintiff.

163.    The above described actions and representations were unfair and deceptive, immoral, unethical, oppressive, substantially injurious to Plaintiff, and manifest an inequitable assertion of bargaining power with regard to Plaintiff.

164.    The above-referenced unfair and deceptive acts and practices were in and affecting commerce and occurred outside of a typical employer-employee relationship.

165.    Plaintiff actually relied on the above-referenced representations of Defendants to his detriment and suffered actual damages as a result.

166.    Defendants' unfair and deceptive acts and practices proximately caused injury to Plaintiff.

167.    As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff has been damaged in an amount in excess of $300,000.00 as may be proven at

trial, and is entitled to recover compensatory damages, treble damages, and attorneys' fees pursuant to N.C. Gen. Stat. § 75-1.1, *et seq.*

## **PRAYER FOR RELIEF**

Plaintiff requests that this Court enter judgment against the Defendants as follows:

1.      Awarding Plaintiff compensatory and statutorily enhanced damages or compensation as provided for under law for each of the causes of action set forth above;

2.      Awarding interest on the monies wrongfully obtained from the date of collection through the date of entry of judgment in this action;

3.      Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

4.      For such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable as a matter of right.


This 23rd day of February, 2018.


s/ Sara Salehi Ash
Sara Salehi Ash
N.C. State Bar No. 44764
sara.ash@troutman.com
TROUTMAN SANDERS LLP
301 South College Street, Suite 3400
Charlotte, North Carolina 28202
Telephone: (704) 998-4069
Facsimile: (704) 998-4051

*Attorneys for Plaintiff*